UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONETTE ROCKYMORE,<br><br>        Plaintiff,<br><br>    v.<br><br>EUROFINS DONOR & PRODUCT TESTING, INC., et al.,<br><br>        Defendants. | Case No. 3:22-cv-00176-WHO<br><br>**ORDER ON MOTION TO DISMISS**<br>Re: Dkt. No. 33 |

Plaintiff Monette Rockymore alleges, as relevant to this motion, that her former employer, defendant Eurofins Donor & Product Testing, Inc. ("Eurofins"), is liable for hostile work environment harassment (and failure to prevent it), intentional infliction of emotional distress ("IIED"), failure to prevent retaliation for opposing discrimination, and breach of contract for terminating her without good cause. Eurofins moves to dismiss those claims, which I previously dismissed with leave to amend. The motion is DENIED on the claims for harassment, IIED, and failure to prevent retaliation, which are now plausibly pleaded. It is GRANTED without leave to amend on the breach of contract claims; even accepting the well-pleaded allegations in the complaint as true, no express or implied good-cause termination contract was formed.[1]

**BACKGROUND**

Rockymore is a woman and identifies herself as "Pacific Islander/Asian." First Amended Complaint ("FAC") [Dkt. No. 32] ¶ 10.a. Some of the defendants are a related group of entities. Eurofins is a corporation with its headquarters in Pennsylvania and, as relevant here, an office in San Ramon, California. *See* Order on Motions to Remand and Dismiss ("Prior Order") [Dkt. No.

---

[1] Oral argument is unnecessary and the hearing on the motion is VACATED. Civ. L.R. 7-1(b).

30] 6; FAC ¶ 2. Several other associated entities are named as defendants in the complaint, which will be collectively referred to here as the Divisional Defendants.[2] Their status is one subject of this motion and is discussed below; in short, they are divisions of Eurofins, not separate entities. Rockymore has also sued individuals Brendan O'Neale, Sara Dionne, and Rohini Ratnam.

Eurofins hired Rockymore in July 2018 as a laboratory manager. FAC ¶ 8. She alleges that she has "cervical lymphadenopathy," which she calls a "viral infection that causes severe liver and kidney inflammation." *Id.* ¶ 10.b. This condition, she says, "required her to have frequent doctor visits" that she informed the defendants about. *Id.* It also required her to "take protected medical leaves." *Id.*

In November 2019, Dionne hired O'Neale as a regional manager to whom Rockymore reported. *Id.* ¶ 12.a. Rockymore alleges that she "immediately felt discriminated [against] and harassed" by O'Neale. *Id.* She claims that he "disfavored" her and other women and "disregarded" her advice. *Id.* At one point, he approached Rockymore and her team and "sarcastic[ally]" said, "[i]s there anything you guys want to brag about?" *Id.* Rockymore reported this to Dionne. *Id.* In February 2020, on a work trip, Dionne and another employee (who is not a defendant) told Rockymore that "she was being written up for" coming "into the office in the middle of the night to complete an urgent request from a client in a timely manner." *Id.* ¶ 12.b. Rockymore alleges that doing so was "normal practice," that another employee had done the same thing without being written up, and that she was "shocked." *Id.*

In March 2020, O'Neale dismissed an employee that Rockymore supervised without her knowledge and said it was part of a "reduction in workforce." *Id.* ¶ 12.c. Rockymore complained to human resources but never heard back. *Id.* She claims that "the majority of male and non-Asian" managers at other labs "had access to subordinates to complete" their work while she "was the only [one] affected by the 'reduction in workforce.'" *Id.* She also complained to human resources that she received less support than male and non-Asian employees, but there was no

---

[2] The Divisional Defendants are Eurofins Denver Corporate, Eurofins Pre-Transplant Testing, Eurofins NSC US, Eurofins DPT San Ramon.

2

result. *Id.* Rockymore's "workload became extremely high" and she could not fill three vacancies in her lab. *Id.* She asked O'Neale and human resources to hire for these vacancies, but she was not granted permission. *Id.*

In April 2020, Rockymore became "severely sick" with "COVID-19 symptoms." *Id.* ¶ 12.d. She took medical leave and, after returning, claims that her "work environment worsened." *Id.* She alleges that O'Neale gave her assignments with "unrealistic timelines, provided her with no support, and heavily micromanaged her," causing "stress and anxiety." *Id.* She "repeatedly" informed O'Neale that she had inadequate support, but he denied her any more. *Id.* She also repeatedly complained over three months to O'Neale because he failed to conduct a performance review for her, despite doing so for "all other managers." *Id.* ¶ 12.e. That review was finalized in August 2020; Rockymore alleges that O'Neale gave her an "unde[]served negative performance review despite her continued perform [sic] her job duties in an exemplary manner as exemplified by the successful support of projects as noted in her performance reviews." *Id.*

Rockymore also alleges that an unspecified "defendant" "would make oral and written assurances of continued employment, and job security and including [sic] that Rockymore continued to perform her job duties in an exemplary manner and that defendants would 'continue to work with Rockymore on stabilizing the San Ramon Lab Operations.'" *Id.* ¶ 12.f. (alteration omitted). She characterizes this as creating a for-cause termination protection, an issue discussed below. *Id.*

On September 10, 2020, Rockymore developed a high fever and was told by her doctor not to go into work due to concerns about COVID-19. *Id.* ¶ 12.g. Rockymore then developed "inflammation to her liver and kidney." *Id.* She was placed on medical leave through September 30, 2020. *Id.* During this leave, O'Neale and Dionne "continued to email her requesting tasks to be completed for work related [sic] projects." *Id.* Rockymore responded by asking Dionne to "request help from others." *Id.* On September 17, she complained to Dionne about "being removed from communications regarding a business project" with which she had been heavily involved and received no response. *Id.*

On September 18, 2020, O'Neale and Ratnam called Rockymore to terminate her due to

3

1  "performance issues." *Id*. She was "shock[ed]" and "felt sick to her stomach." *Id*. She alleges
2  that she had "just launched a successful project" and had never been "informed of any
3  performance issues." *Id.*

4  Rockymore filed this suit in California state court on December 6, 2021, and it was
5  removed to this court in January 2022. Dkt. No. 1. In April 2022, I granted in part and denied in
6  part a motion to dismiss and denied a motion to remand. *See generally* Prior Order. I found
7  Rockymore's claims for race and gender discrimination, retaliation, failure to provide a reasonable
8  accommodation, and negligent supervision plausibly pleaded. *Id.* 1. But I granted the motion
9  with leave to amend on claims for disability discrimination, hostile work environment, breach of
10 contract, and IIED. *Id.* Rockymore filed her FAC in May 2022 and Eurofins again moves to
11 dismiss.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id.* While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

4

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**DISCUSSION**

Eurofins moves to remove the Divisional Defendants from the suit because they are not legal entities that can be sued. Motion to Dismiss ("Mot.") [Dkt. No. 33] 11–12. It also moves to dismiss the claims for harassment (and failure to prevent it), failure to prevent retaliation, IIED, and breach of contract for failure to state a claim. *Id.* 12–16.

## I.   THE DIVISIONAL DEFENDANTS

As I explained in denying a motion to remand, Eurofins "ha[s] shown—and Rockymore has no evidence to dispute—that [the Divisional Defendants] are simply unincorporated divisions of [Eurofins] (not, for instance, subsidiaries that are themselves incorporated)." Prior Order 7. Eurofins now argues, as a result, that they cannot be subject to suit. Mot. 11–12. Rockymore's opposition brief did not address this issue except to say that she "has initiated a meet and confer effort regarding the dismissal of" the Divisional Defendants and that she is "optimistic" it would be completed before the reply brief was filed. Opposition to the Mot. [Dkt. No. 35] 7 n.1. The reply brief states that the parties were "unable to stipulate" to that dismissal. Reply ISO Mot. [Dkt. No. 36] 12.

Rockymore has shown no legal basis to be able to sue an entity that does not have any independent legal status. Corporations are proper defendants; unincorporated divisions of them are simply that—parts of them. *Cf. Breitman v. May Co. Cal.*, 37 F.3d 562, 564 (9th Cir. 1994) (so holding for jurisdictional purposes). And Rockymore's failure to substantively engage with the argument warrants dismissal anyway.

## II. HARASSMENT

Eurofins moves to dismiss Rockymore's claim for harassment under California's Fair Employment and Housing Act ("FEHA"). *See* Mot. 12–14. I previously dismissed the claim with leave to amend. Prior Order 11–12. For the reasons that follow, the motion to dismiss is denied.

"FEHA prohibits harassment of an employee." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013); *see also* Cal. Gov't Code § 12940(j). Under FEHA, a plaintiff must demonstrate that "(1) she is a member of a protected group; (2) she was subjected to harassment because she belonged to this group; and (3) the alleged harassment was so severe that it created a hostile work environment." *Lawler*, 704 F.3d at 1244. "Harassment cannot be occasional, isolated, sporadic, or trivial; rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." *Aguilar v. Avis Rent A Car Sys., Inc.*, 21 Cal. 4th 121, 131 (1999) (internal alterations and citations omitted).

As a general matter, actions are not FEHA harassment if they are mere "commonly necessary personnel management actions." *Lawler*, 704 F.3d at 1244; *Janken v. GM Hughes Elecs.*, 46 Cal. App. 4th 55, 65, 80 (1996). Such actions are those "of a type necessary to carry out the duties of business and personnel management." *Janken*, 46 Cal. App. 4th at 65. They usually include things like "hiring and firing, job or project assignments, office or work station assignments, promotion or demotion, performance evaluations, the provision of support, the assignment or non-assignment of supervisory functions, deciding who will and who will not attend meetings, [and] deciding who will be laid off." *Id.* at 64–65. Harassment, on the other hand, "consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management." *Lawler*, 704 F.3d at 1245. This does not mean that employers can act discriminatorily and cloak their actions in the management exception; instead, "[t]hese actions may retrospectively be found discriminatory if based on improper motives, but in that event the remedies provided by the FEHA are those for discrimination, not harassment." *Janken*, 46 Cal. App. 4th at 65.

In addition to discrimination liability, the California Supreme Court has held that the managerial acts doctrine has another limitation: "some official employment actions done in

furtherance of a supervisor's managerial role can also have a secondary effect of communicating a hostile message." *Roby v. McKesson Corp.*, 47 Cal. 4th 686, 709 (2009), *as modified* (Feb. 10, 2010). But, to establish this sort of liability, the actions must "establish a widespread pattern of bias." *Id.*

The allegations of harassment here are relatively thin, but I conclude that Rockymore has alleged enough to state a claim at the pleadings stage. As I explained the last time around,

> Almost everything [Rockymore] references in the complaint are "commonly necessary personnel actions"—namely, her termination, her supervisors requiring her to carry out tasks while sick, the meeting at which she was admonished, and the refusals to hire more employees for her. They are not actionable as harassment unless they fall into *Roby*'s exception. *See Lawler*, 704 F.3d at 1245; *Janken*, 46 Cal. App. 4th at 65. They do not. She has not adequately pleaded that there was a "widespread pattern of bias" in these actions that had "a secondary effect of communicating a hostile message" sufficiently severe to alter the terms and conditions of employment. *Roby*, 47 Cal. 4th at 709. Indeed, in the curt portion of her brief discussing *Roby*, Rockymore only regurgitates the basic legal principle without engaging at all with her pleadings or explaining why it is met.
>
> The only non-personnel-management act alleged in the complaint is O'Neale's "sarcastic" comment to Rockymore and her team with the gist that they had no good news to report. But that single comment (which is not facially discriminatory) was "isolated" and relatively "trivial" rather than severe, "concerted," or "routine." *Aguilar*, 21 Cal. 4th at 131. Courts have found allegations significantly worse than this—and those more facially discriminatory—to not be harassment. *See, e.g. Brennan v. Townsend & O'Leary Enterprises, Inc.*, 199 Cal. App. 4th 1336, 1353–58 (2011) (rejecting as gender-based harassment an email calling the plaintiff a "big-titted, mindless one" sent between coworkers, a male employee asking women to sit on his lap while dressed as Santa Clause, an employee wearing a "veil . . . with a plastic penis attached" in a staff meeting, and a supervisor asking questions about the plaintiff's sex life).

Prior Order 12.

Rockymore has added allegations and argument that nudge the claim past the plausibility line under *Roby*. Specifically, she included details about a persistent pattern of personnel actions beyond the discrete ones about her firing. She alleges that O'Neale gave her assignments with unrealistic timelines but that there was no similar treatment for other managers. FAC ¶ 12.d–12.f. She states that he did so over the course of months. *Id.* She says that he refused to perform a performance review for months despite doing so for others. *Id.* She asserts that she raised this issue multiple times but was rebuffed. *Id.* This, coupled with the prior allegations that she was made to do tasks while out sick and unjustly and pretextually terminated, are sufficient to

7

plausibly have "a secondary effect of communicating a hostile message" severe enough to alter the terms and conditions of employment. *Roby*, 47 Cal. 4th at 709. The new allegations—in part by "casting [the previously alleged] decisions in a new light," *Quigley v. United Airlines, Inc.*, No. 3:21-CV-00538-WHO, 2021 WL 2590147, at *5 (N.D. Cal. June 24, 2021)—could plausibly establish the necessary "*pattern* of bias." *Roby*, 47 Cal. 4th at 709 (emphasis added). And while many of these actions are still managerial, the *Roby* doctrine applies to them all the same. The allegations are not particularly robust, but they are enough at this stage.

As a result, I also reject Eurofins's argument that the *failure to prevent* harassment claim, *see* Cal. Gov't Code § 12940(k), must be dismissed because the arguments for dismissal are derivative of those for the substantive claim. *See* Mot. 14–15.

### III. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Eurofins also moves to dismiss the IIED claim. *See* Mot. 15–16. I previously rejected its argument that the IIED claim was preempted by California's workers' compensation scheme, but I agreed with it that the claim was inadequately pleaded. *See* Prior Order 19–22. For the reasons that follow, the motion to dismiss is denied.

"To state a cause of action for intentional infliction of emotional distress a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." *Vasquez v. Franklin Mgmt. Real Est. Fund, Inc.*, 222 Cal. App. 4th 819, 832 (2013) (internal quotation marks and alteration omitted). In this context, "outrageous conduct" means conduct that is "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009). It is not sufficient that the conduct be "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Lawler*, 704 F.3d at 1245. Just as with a FEHA harassment claim, IIED claims cannot be premised on mere managerial actions unless there is something about it that elevates it to being independently actionable. *Id.*; *see, e.g.*, *Cordova v. Target Corp.*, No. 2:16-cv-04809-SVW-AJW, 2016 U.S. Dist. LEXIS 114995, at *5 (C.D. Cal. Aug. 26, 2016) (finding a plausible IIED claim

8

1   when a supervisor used "racially charged statements" and "made several other disparaging
2   comments towards him based on national origin, ancestry, age and parental-status").

3       Just as with the harassment claim, the allegations here are thin but, at this early stage,
4   enough to get over the plausibility line. In particular, it is plausible (as explained above) that the
5   acts complained of constitute a widespread pattern of bias that sent Rockymore a message that she
6   was unwelcome in the workplace. And it is plausible, for the reasons explained in the Prior Order,
7   that some of the official actions were taken with discriminatory intent. *See* Prior Order 9–11.
8   Putting these together, it is therefore plausible that, considering the "whole gestalt of the FAC,"
9   *Quigley*, 2021 WL 2590147, at *5, the defendants were engaging in "outrageous conduct" in
10  reckless disregard of a probability of Rockymore suffering. In other words, this is plausibly not
11  just a case about a series of managerial actions that could not be independently actionable as IIED,
12  *see Lawler*, 704 F.3d at 1245; it is a case about such actions motivated by potential discriminatory
13  animus and resulting in a hostile work environment.

14  **IV.    FAILURE TO PREVENT RETALIATION**

15      Eurofins moves to dismiss the claim for failure to prevent retaliation because, it argues, no
16  such cause of action exists. Mot. 14. I previously held that the substantive retaliation claim could
17  proceed on the basis of one alleged protected activity—complaints about O'Neale's alleged
18  discrimination—but not others. Prior Order 12–15. I conclude that a claim for failure to prevent
19  retaliation is legally viable on facts like these and deny the motion to dismiss.

20      FEHA, everyone agrees, explicitly provides causes of action for failure to prevent
21  *discrimination* and *harassment*. Cal. Gov't Code § 12940(k). Eurofins argues, however, that
22  *retaliation* does not appear in that list. Mot. 14. And, indeed, retaliation (not failure to prevent it)
23  is addressed in a different subsection of the statute. *See* Cal. Gov't Code § 12940(h).

24      In *Taylor v. City of Los Angeles Dep't of Water & Power*, the California Court of Appeal
25  addressed this precise question and held that, for purposes of the failure-to-prevent statute,
26  retaliation "is a form of discrimination" (at least when the retaliation is, as here, about complaints
27  of discrimination). 144 Cal. App. 4th 1216, 1239–40 (2006), *disapproved of on other grounds by*
28  *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158 (2008). That court followed the lead of

9

1    the Hon. Phyllis Hamilton in this district, who reached the same conclusion. *See Giovannetti v.*

2    *Trustees of California State Univ. (Humboldt State Univ.)*, No. C 04-5514 PJH, 2006 WL

3    1626990, at *9 (N.D. Cal. June 12, 2006). As *Taylor* explained, the California Supreme Court had

4    previously characterized retaliation for opposing discrimination under FEHA as itself a form of

5    discrimination. *See Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1049 (2005). And, in fact,

6    the statute also characterizes retaliation for opposing discrimination as a form of discrimination.

7    *See* Cal. Gov't Code § 12940(h). I agree with this reasoning. Even if I did not, I would be

8    obligated to follow the Court of Appeal's interpretation of state law unless I were convinced it

9    erred. *See N.L.R.B. v. Calkins*, 187 F.3d 1080, 1089 (9th Cir. 1999).[3] The claim is viable.

## V. BREACH OF CONTRACT

Eurofins moves to dismiss the breach of express contract and breach of implied contract claims, which assert that Rockymore had good-cause protection from termination. Mot. 16–17. I previously dismissed those claims with leave to amend. Prior Order 16–17. For the reasons that follow, the claims are again dismissed, this time without leave to amend.

In California, there is a statutory presumption that employment is at will. Cal. Lab. Code § 2922; *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 355 (2000). That presumption can be overcome if the employer and employee provide otherwise by contract. *See Guz*, 24 Cal. 4th at 335–36. The classic contractual alternative is "an agreement that the employee will be terminated only for 'good cause.'" *Id.* at 336. This "contractual understanding need not be express, but may be implied in fact, arising from the parties' conduct evidencing their actual mutual intent to create such enforceable limitations." *Id.* Under California law, "a contract implied in fact consists of obligations arising from a mutual agreement and intent to promise where the agreement and promise have not been expressed in words." *Retired Employees Assn. of Orange Cty., Inc. v. Cty. of Orange*, 52 Cal. 4th 1171, 1178 (2011) (internal quotation marks omitted); *see also* Cal. Civ.

---

[3] Eurofins seeks to discount *Taylor*'s holding about retaliation because the California Supreme Court disapproved of its holding about a different issue in the case—whether non-employers could be held liable for harassment. *Jones v. Lodge at Torrey Pines P'ship*, 42 Cal. 4th 1158, 1174 (2008). The two issues are entirely distinct; the Supreme Court's reasoning about non-employer liability does not undermine the Court of Appeal's reasoning about retaliation.

1 Code § 1621.

At the outset, I note that Rockymore does not allege that her written job contract actually included a good-cause provision. To the contrary, her theory is that she later formed (1) an express oral contract and (2) an implied-in-fact contract.

Rockymore includes two sets of allegations to support her assertion that she and Eurofins had created contractual good-cause protection. The first just parrots the legal test. She alleges, for instance, that:

> On the basis of oral assurances of continued employment given to plaintiff by defendants' supervisors, the length of plaintiff's employment with defendants, defendants' actual practice of terminating employment only for cause, and the industry standard for the business defendants engaged in of terminating employment only for cause, plaintiff and defendants shared the actual understanding that plaintiff's employment could and would be terminated only for cause. This shared understanding resulted in an implied contract requiring that defendants have good cause to terminate plaintiff's employment.

FAC ¶ 70. This is conclusory and threadbare; it is therefore insufficient to state a claim. *See Iqbal*, 556 U.S. at 678; *Gilead*, 536 F.3d at 1055. It gives Eurofins no fair shot at arguing the alleged representations of good-cause protection are insufficient and gives me no way to evaluate it.

The other set of allegations are, as they must be, less conclusory about why an express oral contract or implied-in-fact contract exists. Rockymore alleges that,

> During Rockymore's employment with Defendant, Defendant would make oral and written assurances of continued employment, and job security and including [sic] that Rockymore continued to perform her job duties in an exemplary manner and that defendants would "continue to work with [Rockymore] on stabilizing the San Ramon Lab Operations[.]" Thus, Defendant's [sic] expressly promised to Plaintiff to not terminate except for good cause.

FAC ¶ 12.f (first alteration in original). This is the only allegation supporting this claim that is more than conclusory about how any alleged good-cause contract was formed. But it is insufficient as a matter of law. To start, Rockymore never identifies who made it. She states that "defendant" did so, but there are many defendants in this case. Eurofins as an entity cannot have "made" the statement because it must speak through its employees. Still more, parts of the statement read in isolation—such as nebulous "oral and written assurances of continued employment"—would be too conclusory on their own in any event. Read in context, it appears

11

that most of this legal verbiage is window-dressing.

More importantly (and setting these deficiencies aside) the only well-pleaded allegations in the complaint do not amount to a good-cause termination contract. The only *factual* allegations are that someone told Rockymore that (1) she was performing in "an exemplary manner" and (2) that they would "continue to work with [Rockymore] on stabilizing the San Ramon Lab Operations." Neither of these (nor both of them together) even arguably would create good-cause protection.[4] Praising someone's work in this way does not arguably manifest objective intent to create a good-cause employment protection or evidence a commitment to only terminate the employee for good-cause. *Cf. Davis v. Zurich Am. Ins. Co.*, No. 3:19-CV-04397-WHO, 2021 WL 369538, at *15 (N.D. Cal. Feb. 3, 2021) ("Relatedly, Davis argues that 'Zurich treated Davis as a valuable asset and gave him consistently positive reviews.' Again, such treatment cannot itself (or coupled with longevity) transmute at-will employment into something more. *Guz*, 24 Cal. 4th at 341–42. Conspicuously absent from this 'treat[ment],' too, is any indication that either party understood good performance reviews to lead to good-cause protection." (citation omitted)). And while Rockymore seeks to spin a statement about "continuing to work" together into a contract, no reasonable jury would understand that in context as an objective manifestation of intent to create a good-cause termination protection. Even as Rockymore alleges it, the statement is a descriptive one about continuing to work on the particular job she was hired to do. *Cf. id.*, at *16 (examining even more definitive statements about a future working relationship and finding that they did not create a good-cause contract as a matter of law). Finally, even though this allegation ends by pleading that "[t]hus, Defendant's [sic] expressly promised to Plaintiff to not terminate except for good cause," it is clear Rockymore means that the previously discussed allegations were that alleged promise (and not that there was some vague separate express promise that has been, for no apparent reason, not pleaded).

---

[4] Rockymore argues that whether a contract did exist is a question for a jury. While "[g]enerally, the existence of an implied-in-fact contract requiring good cause for termination is a question for the trier of fact," *Stillwell v. The Salvation Army*, 167 Cal. App. 4th 360, 380 (2008), like any issue, dismissal can be proper if the well-pleaded allegations, accepted as true, would not state a claim.

12

The question, then, is whether to grant leave to amend. As noted, leave to amend should generally be granted; here, however, it is not warranted. *See Lopez*, 203 F.3d at 1127. In ruling on the previous motion to dismiss, I explained that "Rockymore has leave to amend to plead the *factual* allegations underlying this alleged contract so that the pleading is plausible." Prior Order 17 (emphasis in original). She has now tried to do so, and I address those factual allegations above. The problem now is not that her factual allegations are unpleaded, it is that they are pleaded but insufficient as a matter of law. And Rockymore has not indicated that there are further allegations that she has, for whatever reason, decided not to plead about this issue. Accordingly, this dismissal is without leave to amend. *See Lopez*, 203 F.3d at 1127 (withholding leave to amend when there are no further allegations that would cure the deficiency).

## CONCLUSION

The motion to dismiss is GRANTED without leave to amend on the breach of express contract and breach of implied contract claims and to the extent the suit is against the Divisional Defendants. It is otherwise DENIED. Eurofins shall answer the complaint within 14 days. *See* Fed. R. Civ. P. 12(a)(4)(A).

A Case Management Conference is set for August 30, 2022, at 2:00 p.m. The Joint Case Management Statement shall be filed by August 23, 2022.

**IT IS SO ORDERED.**

Dated: July 11, 2022

William H. Orrick
United States District Judge